# IN THE COURT OF APPEALS OF IOWA

No. 15-0656
Filed July 9, 2015

**IN THE INTEREST OF E.N. and J.N.,**
    Minor Children,

**M.N., Mother,**
    Appellant,

**A.N., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Franklin County, Peter B. Newell, District Associate Judge.

A mother and father separately appeal the termination of their parental rights to two children. **AFFIRMED ON BOTH APPEALS.**

Larry W. Johnson of Walters & Johnson, Iowa Falls, for appellant-mother.

Barbara J. Westphal, Belmond, for appellant-father.

Thomas J. Miller, Attorney General, Kathryn S. Miller-Todd and Kathryn Lang, Assistant Attorneys General, Dan Wiechmann, County Attorney, and Brent J. Symens, Assistant County Attorney, for appellee.

Alesha M. Sigmeth Roberts of Elbert Law Office, P.L.C., Clarion, attorney and guardian ad litem for minor children.

Considered by Vogel, P.J. and Tabor and McDonald, JJ.

**TABOR, J.**

Melissa and Arthur challenge the order terminating their parental rights to their two children, E.N. (born in 2007) and J.N. (born in 2008). The parents are married, but separated. In May 2012, Melissa moved to the state of New York with the children, but Arthur brought them back to Iowa where they have continued to reside.

E.N. and J.N. came to the attention of the Iowa Department of Human Services (DHS) on December 31, 2012, following a founded incident of child abuse involving Arthur's failure to supervise. The DHS had concerns for the children's health and safety in Arthur's home, which was filled with garbage. Dirty dishes and laundry piled up and cockroaches were prevalent in the house. The children had poor hygiene and head lice.

The DHS removed the children and the juvenile court adjudicated them as children in need of assistance (CINA) on March 4, 2013. Arthur participated in visitation, including overnight visits and transports to and from school. Arthur advanced in his parenting skills and the housing situation improved. As a result, in December 2013 the juvenile court granted Arthur an additional six months to reunify with the children. The children remained in foster care until March 2014, when they were returned to Arthur's care.

But their return home was short-lived. At a review hearing on June 16, 2014, the court viewed a video showing Arthur hitting E.N. in the back of the head and knocking her to the ground. The condition of the household had also deteriorated again. The children were removed a second time on June 30, 2014,

and have been out of the father's care since then. Arthur has continued with supervised visitation since the second removal.

Since the children left New York, they have not had visitation with their mother, though they have spoken with her two or three times a week on the telephone. Melissa has not provided any financial support for the children.

On October 19, 2014, the State filed a petition to terminate the rights of both parents—citing Iowa Code sections 232.116(1)(f) and (i) (2013). The juvenile court originally scheduled the termination hearing for November 13, 2014, but continued the hearing three times to accommodate requests by Melissa and her attorney. The court eventually held the termination hearing, without Melissa's presence, on March 12, 2015. The State and guardian ad litem (GAL) presented several witnesses. Arthur also testified at the hearing.

On April 13, 2015, the juvenile court issued an order terminating the rights of Melissa and Arthur under paragraph (f) of section 232.116(1). Both parents now appeal. The GAL recommended termination in the juvenile court and joins the State's brief in support of termination on appeal.

We review termination proceedings de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). We will uphold an order terminating parental rights if the juvenile court's findings are supported by clear and convincing evidence. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). Evidence is "clear and convincing" when a reviewing court has no serious or substantial doubts as to the correctness of the conclusions of law drawn from the proof. *Id.*

We address the appeals by Melissa and Arthur separately.

## I.     Melissa's appeal

Melissa has not had in-person contact with the children since the initiation of the CINA proceedings.[1]  She did maintain regular telephone contact with the children, though case workers testified the children did not look forward to the calls.  Melissa did not attend the termination hearing.  Her attorney appeared and told the court that Melissa had started a new job in New York and was unable to participate in the hearing even by telephone.

At the beginning of these proceedings, authorities determined Melissa was living in New York with a registered sex offender.  In December 2013, the Iowa DHS asked its New York State counterpart to conduct a "parent home study" regarding Melissa through the Interstate Compact on the Placement of Children (ICPC).[2]  In February 2014, the New York State office recommended "placement not be made."  A letter from the department of social services in Tomkins County, New York stated Melissa had moved out of the house she had been renting from her mother and stepfather.  Melissa's boyfriend indicated to the New York case worker that they had not been paying their rent and did not plan to return to that

[1] According to the record, Melissa has not seen the children since November 2012.
[2] The ICPC states, in pertinent part:
> The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

Iowa Code § 232.158(3)(d).  Courts in other states appear to be split as to whether the ICPC applies to out-of-state, noncustodial parents.  *See In re Emoni W.*, 48 A.3d 1, 15 n.5, 6 (Conn. 2012) (McLachlan, J., dissenting) (collecting cases).  Since this issue is not squarely before us, we decline to address it.

residence. The letter stated Melissa would need to locate stable housing before a home study could be completed in New York.

The home study issue is the basis of Melissa's petition on appeal. She does not challenge the ground under which her rights were terminated. She argues only that the State did not make a concerted effort to reunify her with the children. She claims the DHS did not make reasonable efforts because the agency failed to arrange a "successful home study."

The DHS is required to make every reasonable effort to return children home—consistent with their best interests. Iowa Code § 232.102(7); *C.B.*, 611 N.W.2d at 493. But the reasonable-efforts requirement is not a strict substantive condition for termination. *C.B.*, 611 N.W.2d at 493. Rather the requirement affects the State's burden of proving the children cannot be safely returned to the care of a parent. *Id.* The DHS is only required to supply those services that are reasonable under the circumstances. *In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000).

In this case, presuming an ICPC home study falls into the category of reasonable efforts, we conclude Melissa failed to preserve error on her appellate claim. The juvenile court did not rule on her reasonable-efforts argument. Melissa did not file a motion under Iowa Rule of Civil Procedure 1.904(2) asking for resolution of that claim. A rule 1.904(2) motion is essential to preservation of error when a trial court does not resolve an issue. *In re A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994). Moreover, nothing in the termination record shows that Melissa requested any other services to facilitate reunification with her son and

daughter.[3]  Because the issue is not preserved, we decline to grant relief on her reason-efforts claim.

**II.    Arthur's appeal**

Arthur raises four issues in his petition on appeal.  He first challenges the ground for termination under section 232.116(1).  He also argues termination was not in the children's best interest under the framework in section 232.116(2) and the court should have declined to terminate under section 232.116(3)(c) because of the children's strong bond with him.  He finally claims he should have been granted an additional six months to work towards reunification.  We will address each of his claims in turn.

**A.  Ground for termination**

Arthur's parental rights were terminated under section 232.116(1)(f), which requires the court to find:

(1) The child is four years of age or older.
(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
(3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Arthur argues the children can be returned to his care at the present time.[4]

We disagree.  After engaging in our de novo review of the record, we find clear

---

[3] Melissa only completed a mental health evaluation a few months before the State filed the termination petition.  And she did not provide the Iowa DHS case worker with updated mental health reports as she had agreed to do.

and convincing proof that Arthur cannot, over the long term, provide a safe and stable home for the children despite more than two years of DHS involvement. We acknowledge Arthur has taken some steps toward maintaining a cleaner home and addressing his anger issues. But we share the concern of the juvenile court that Arthur is "still unable to meet the very basic needs of his children."

The children were originally removed because of the deplorable conditions in Arthur's home. After fifteen months, the children were returned to Arthur's care because the situation had improved, most likely due to help he received from his paramour at the time. Case workers' visits to his residence in Chapin revealed the home decreased in cleanliness each month following the children's return. The children were removed again in June 2014 and Arthur was evicted in July 2014. Following his eviction, the children's foster mother went into the home to retrieve some of the children's belongings. She testified the house was extremely dirty, the toilet was unusable, and the smell from the children's room was unbearable. The children's clothes were dirty and covered in cockroaches. The record indicates E.N. had a serious case of lice and J.N. had to be re-potty trained. Both of the children's behavior had regressed.

Arthur argues he has now "located suitable housing for him and his children." The cases workers acknowledged at the termination hearing that Arthur's apartment was satisfactory, but they also worried it was getting cluttered

---

[4] "At the present time" means the time of the termination hearing. *See A.M.*, 843 N.W.2d at 111.

again and that he was allowing two friends to keep their belongings and pets there, as well as occasionally staying there themselves.

While the reports of Arthur's new residence are generally positive, we gain insight into the children's prospects "by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities." *In re M.S.*, 519 N.W.2d 398, 400 (Iowa 1994). Twice the children have been removed from Arthur's care because they lived in sub-standard conditions. During the life of this case, Arthur has been unable to incorporate DHS recommendations into his care taking or follow through with the services provided. At the termination hearing, he minimized the deteriorating condition of his current apartment, saying: "it is cluttered. . . . Guys just don't get into cleaning houses, you know." We lack confidence Arthur would be willing and able to provide a sanitary and stable home environment the children if they were returned to his care.

The termination testimony also reflected serious concerns about Arthur's temper. Domestic abuse occurred in the relationship between Arthur and Melissa. Arthur also directed abuse toward his children. The juvenile court witnessed Arthur "exploding in anger" toward E.N. in a video recorded by Arthur's adult daughter, who testified she was concerned for the safety of her half-siblings. Arthur often made verbal threats toward the children. Arthur also directed threats toward the foster mother, which resulted in the children being relocated and the identity of the new foster family being withheld from Arthur. While Arthur expressed a willingness to engage in anger management classes,

he did not start that process until late in the CINA case and did not attend many sessions.

Given his past performance and inability to respond to services provided, we conclude the State proved the ground for termination by clear and convincing evidence.

## B. Best Interests

Even with the statutory basis proved, the decision to terminate must be in the best interests of the children under section 232.116(2). *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). In determining the children's best interests, we give primary consideration to the children's safety, to the best placement for furthering their long-term nurturing and growth, and to their physical, mental, and emotional conditions and needs. *See* Iowa Code § 232.116(2). Arthur challenges the termination as not being in the best interest of the children under 232.116(2) as he has attained suitable housing and made improvements in his parenting skills.

As discussed above, Arthur has had opportunities to show improvement, and has done so, only to backslide into subjecting the children to an unsuitable living situation. We conclude it is not in the children's best interest to prolong their wait for a consistent and stable environment. The children have regressed when in their father's care. When with her father, E.N. falls into a pattern of being "very parentified" and tries to control the household, because it fell to her to do so when her father did not assume a strong parenting role. J.N. is at times fearful of his father and acts aggressively toward peers. The GAL believed the children would go into "survival mode" if placed back into Arthur's custody.

The children's safety, as well as their long-term nurturing and emotional growth, is best served by terminating Arthur's parental rights and giving them a chance at permanency.

## C. Strength of Bond

Arthur argues there is clear and convincing evidence that termination will be detrimental to the children because of the closeness of their relationship with him. *See* Iowa Code § 232.116(3)(c). The evidence presented at the termination hearing indicated the existence of a bond between Arthur and the children, but did not show severance would result in long-term harm to E.N. and J.N.

Although J.N. and his father have a close relationship, at times the boy has expressed fear of his father. The DHS worker also testified the bond between E.N. and Arthur is less one of father and daughter and more one of co-parents. Given the unhealthy dynamic that has developed between them, we do not find clear and convincing evidence that severing ties with their father will be detrimental to these children.

The factors in section 232.116(3) are permissive. Courts may use their discretion in deciding whether the strength of the bond signals that termination is not in the best interest of the child. *See A.M.*, 843 N.W.2d at 113. We find the following testimony from the social worker to be persuasive: "Given a consistent environment with positive input and structure, [J.N.] and [E.N.] will do very well. . . . They would, of course, miss Art. . . . But I believe they would thrive and they would be able to move on."

**D. Additional Time**

Finally, alleging he has shown significant progress in his housing and parenting skills, Arthur asks for an additional six months to work toward reunification. The juvenile court may grant more time only if the judge finds whatever prompted removal of the children will be resolved at the end of the six months. *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005). Arthur has already been granted one six-month extension and, in fact, received another five-month reprieve by virtue of the continuances of the termination hearing. Arthur has received services from DHS for more than two years, yet has been unable to engrain the parenting and daily living skills needed to properly maintain a home for the children. Arthur—who was fifty-six years old at the time of the termination hearing—admitted his skills were a "work in progress."

"A parent does not have an unlimited amount of time in which to correct his or her deficiencies." *In re H.L.B.R.*, 567 N.W.2d 675, 677 (Iowa Ct. App. 1997). We have repeatedly held fast to the principle that statutory time limits should be followed and children not forced to wait for parents to fix the problems in their own lives. *In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998). While Arthur's efforts do not go unnoticed, the children need permanency, and given his history, we do not believe extra time would resolve the need for removal. *See* Iowa Code § 232.104(2)(b).

**AFFIRMED ON BOTH APPEALS.**